## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ALEX SANCHEZ,

               Plaintiff,

vs.                                Case No. 6:17-cv-00535-Orl-40JRK

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

               Defendant.

_____/

## **REPORT AND RECOMMENDATION**[1]

### **I. Status**

Alex Sanchez ("Plaintiff") is appealing the Commissioner of the Social Security Administration's ("SSA('s)") final decision denying his claim for supplemental security income ("SSI").[2] Plaintiff's alleged inability to work is a result of four herniated discs at C-5 and C-6, depression, anxiety, tinnitus, Meniere's disease, headaches, and seizure disorder. Transcript of Administrative Proceedings (Doc. No. 14; "Tr." or "administrative transcript"), filed May 31, 2017, at 85-86, 120, 265. On August 24, 2013, Plaintiff filed an application for SSI,[3] alleging

---

[1]    "Within 14 days after being served with a copy of [a report and recommendation on a dispositive issue], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." Id. A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. See Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

[2]    Plaintiff also filed an application for disability insurance benefits ("DIB"), that was denied initially, see Tr. at 72, 74-84, 100, 142-44, and on reconsideration, see Tr. at 102, 104-19, 138, 150-54. The denial of Plaintiff's application for DIB, however, is not at issue in this case because the "portion of [Plaintiff's] request for hearing . . . based on the claim for [DIB] . . . [was] dismissed." Tr. at 34 (capitalization omitted).

[3]    Although actually completed on August 24, 2013, see Tr. at 234, the protective filing date of the SSI application is listed elsewhere in the administrative transcript as August 12, 2013, see, e.g.,

(continued...)

an onset disability date of November 15, 2008. Tr. at 234. Plaintiff's application was denied initially, see Tr. at 73, 85-99, 101, 145-47, and again upon reconsideration, see Tr. at 103, 120-37, 139, 155-59.

On October 26, 2015, an Administrative Law Judge ("ALJ") held a hearing, during which she heard from Plaintiff, who was represented by counsel, and a vocational expert ("VE"). See Tr. at 43-71. The ALJ issued a decision on January 8, 2016, finding Plaintiff not disabled through the date of the Decision. See Tr. at 19-34.

On January 25, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's Decision the final decision of the Commissioner. See Tr. at 1-3. On March 27, 2017, Plaintiff commenced this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) by timely filing a Complaint (Doc. No. 1), seeking judicial review of the Commissioner's final decision.

Plaintiff makes three arguments on appeal: 1) "[t]he ALJ's findings that Plaintiff only suffers from moderate impairment in activities of daily living and social functioning are not based upon substantial evidence"; 2) "Plaintiff's residual medical conditions from a subdural hemorrhage meet or medically equal Listing 11.18 for cerebral trauma"; and 3) "[t]he ALJ's [residual functioning capacity ("RFC")] assessment is not based on substantial evidence because the ALJ fail[ed] to incorporate all [of] . . . Plaintiff's severe impairments into the RFC." Plaintiff's Motion for Summary Judgment (Doc. No. 18; "Pl.'s Mem."),[4] filed July 31,

---

[3](...continued)
Tr. at 85. This does not affect the undersigned's recommendation.

[4]     The Scheduling Order (Doc. No. 15), entered June 2, 2017, directed the parties to file memoranda, rather than motions, in support of their respective positions. The Court thus construes Plaintiff's Motion for Summary Judgment as a memorandum.

2017, at 2, 17, 23, 27 (emphasis omitted); see id. at 17-23 (first argument), 23-27 (second argument), 27-28 (third argument). On September 26, 2017, Defendant filed a Memorandum in Support of the Commissioner's Decision (Doc. No. 19; "Def.'s Mem.") addressing Plaintiff's arguments. After a thorough review of the entire record and the parties' respective memoranda, the undersigned recommends that the Commissioner's final decision be reversed and remanded for further administrative proceedings.

On remand, a proper determination of the severity of Plaintiff's limitations in social functioning and activities of daily living (Plaintiff's first argument) and a proper consideration of whether Plaintiff's impairments meet or medically equal Listing 11.18 (Plaintiff's second argument) may impact the ALJ's RFC determination (Plaintiff's third argument). For this reason, the undersigned need not address Plaintiff's third argument. See Jackson v. Bowen, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam) (declining to address certain issues because they were likely to be reconsidered on remand); Demenech v. Sec'y of the Dep't of Health & Human Servs., 913 F.2d 882, 884 (11th Cir. 1990) (per curiam) (concluding that certain arguments need not be addressed when the case would be remanded on other issues).

## II. The ALJ's Decision

When determining whether an individual is disabled,[5] an ALJ must follow the five-step sequential inquiry set forth in the Code of Federal Regulations ("Regulations"), determining as appropriate whether the claimant (1) is currently employed or engaging in substantial

---

[5]    "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

gainful activity; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals one listed in the Regulations; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004). The claimant bears the burden of persuasion through step four and, at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Here, the ALJ engaged in the five-step sequential inquiry. See Tr. at 21-33. At step one, the ALJ determined that Plaintiff "has not engaged in substantial gainful activity since August 12, 2013, the application date." Tr. at 21 (emphasis and citation omitted). At step two, the ALJ found that Plaintiff "has the following severe impairments: status post right craniotomy after subdural hematoma; seizures; degenerative disc disease of the cervical spine; right ulnar neuropathy; headaches; affective disorder; anxiety disorder; and cognitive disorder." Tr. at 21 (emphasis and citation omitted). At step three, the ALJ ascertained that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 [C.F.R.] Part 404, Subpart P, Appendix 1." Tr. at 21 (emphasis and citation omitted).

The ALJ determined that Plaintiff has the following RFC:

[Plaintiff can] perform sedentary work as defined in 20 [C.F.R. §] 416.967(a) except that he can never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; and occasionally balance, stoop, kneel, crouch, or crawl. He can frequently (as opposed to constantly) reach with his bilateral upper extremities. He must avoid even moderate exposure to vibration and workplace hazards. He can perform simple, routine, repetitive tasks with minimal changes in a routine work setting. He can occasionally interact with supervisors, coworkers, and the general public.

Tr. at 23 (emphasis omitted). At step four, the ALJ relied on the testimony of the VE and

found that Plaintiff "is unable to perform any of his past relevant work." Tr. at 32 (emphasis and citation omitted). At step five, after considering Plaintiff's age ("33 years old . . . on the date the application was filed"), education ("at least a high school education"), work experience, and RFC, the ALJ again relied on the testimony of the VE and found "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform," Tr. at 32-33 (emphasis and citation omitted), such as "document preparer," "final assembler," and "call out operator." Tr. at 33. The ALJ concluded Plaintiff "has not been under a disability . . . since August 12, 2013, the date the application was filed." Tr. at 33 (emphasis and citation omitted).

### III. Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991)

(internal quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

## IV. Discussion

The undersigned first addresses the ALJ's determination of Plaintiff's limitations in social functioning and activities of daily living. Then, the issue of whether Plaintiff's impairments meet or medically equal Listing 11.18 is discussed.[6]

### A. Activities of Daily Living and Social Functioning

At step two of the sequential evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. See 20 C.F.R. § 404.1520(a)(4)(ii). At this step, "[a]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work[.]" Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984). "The 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). In the context of a Social Security disability benefits case, a condition is severe if it affects a claimant's ability to maintain employment. See id.

When evaluating mental impairments, the Regulations in effect at the time the

---

[6]     As noted, Plaintiff's third argument regarding the ALJ's RFC determination is not addressed.

Decision was rendered directed the use of a "'special technique' dictated by the PRTF [Psychiatric Review Technique Form] for evaluating mental impairments." Moore v. Barnhart, 405 F.3d 1208, 1213 (11th Cir. 2005) (citing 20 C.F.R. § 404.1520a(a)[7]). The PRTF is further described in the introduction to section 12.00 of the listing of impairments. See 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(A) (effective December 18, 2007) (revised September 26, 2016), https://secure.ssa.gov/poms.nsf/lnx/0434132009.[8] In the first step of the psychiatric review technique, it is determined whether a claimant has a medically determinable mental impairment using the criteria in "paragraph A" of the listing of impairments. 20 C.F.R. §§ 404.1520a(b)(1) and 416.920a(b)(1); 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(A) (effective December 18, 2007) (revised September 26, 2016).

Next, if there is a medically determinable mental impairment, the degree of functional limitation resulting from such impairment is ascertained. 20 C.F.R. §§ 404.1520a(C) and 416.920a(C). The degree of functional limitation resulting from a medically determinable mental impairment is ascertained by rating four "broad functional areas" in "paragraph B" of the listings: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3); 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(C) (effective December 18, 2007) (revised September 26, 2016).

---

[7] The Regulation was substantially amended on March 27, 2017. However, the relevant one for purposes of this appeal is the version that was in effect from June 11, 2011 to January 16, 2017.

[8]e On September 26, 2016, the SSA revised section 12.00 of the listing of impairments, effective January 17, 2017. See Revised Medical Criteria for Evaluating Mental Disorders, 65 FR 50746-01, 2016 WL 5341732, at *66138. The SSA clarified, however, that "[f]ederal courts will review [the Commissioner's] final decisions using the rules that were in effect at the time [the SSA] issued the decisions." Id. n.1. Thus, the relevant version of section 12.00 for purposes of this appeal is the one that was in effect on January 8, 2016, the date of the ALJ's decision. See Tr. at 34.

The first three broad functional areas are rated using a five-point scale: none, mild, moderate, marked, and severe. 20 C.F.R. §§ 404.1520a(c)(4) and 416.920a(c)(4). The fourth is rated using a four-point scale: none, one or two, three, four or more. 20 C.F.R. §§ 404.1520a(c)(4) and 416.920a(c)(4). "Marked" means "more than moderate but less than extreme" and occurs when "several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [an individual's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(C) (effective December 18, 2007) (revised September 26, 2016).

After the degree of functional limitation resulting from the claimant's medically determinable mental impairment is rated, the severity of the mental impairment is established. 20 C.F.R. §§ 404.1520a(d) and 416.920a(d). The four broad functional areas "are used to rate the severity of mental impairments at steps [two] and [three] of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4. If the first three of the four broad functional areas are rated "none" or "mild," and the forth area is rated as "none," the Commissioner generally concludes that the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).

Plaintiff contends the ALJ's findings that Plaintiff has moderate limitations in social functioning and activities of daily living are not supported by substantial evidence. See Pl.'s Mem. at 18-23. Plaintiff also asserts that "the ALJ [did] not take into account Plaintiff's headaches and seizures when considering these domains," and that this failure is

"detrimental to the overall quality of the ALJ's assessment." Id. at 22-23. Responding, Defendant asserts that "Plaintiff's arguments do not undermine the substantial evidence supporting the ALJ's . . . findings, but instead invite the Court to impermissibly reweigh the evidence." Id. at 10.

The ALJ's analysis of Plaintiff's limitations in social functioning and activities of daily living are discussed in turn. Then, the undersigned addresses Plaintiff's claim regarding the ALJ's alleged failure to consider Plaintiff's headaches and seizures when evaluating Plaintiff's limitations in social functioning and activities of daily living.

1. Social Functioning

The Regulations define social functioning as follows:

[A claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. [The claimant] may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. [The claimant] may exhibit strength in social functioning by such things as [his] ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. [An ALJ] also need[s] to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2) (effective December 18, 2007) (revised September 26, 2016). A "marked" limitation in social functioning is "not defined by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function." Id. For instance, if the claimant is "highly antagonistic, uncooperative, or hostile but [is] tolerated by local storekeepers, [the ALJ] may

nevertheless find that [the claimant] ha[s] a marked limitation in social functioning because that behavior is not acceptable in other social contexts." Id.

Here, the ALJ concluded that Plaintiff has "moderate difficulties" in social functioning after finding the following:

> [Plaintiff] reported to mental treatment providers having mood swings and anger outbursts. He also reports not having friends anymore, thinking that others are making fun of him, not wanting to be in public, and not wanting to be told what to do. He also occasionally was defensive or guarded with treatment providers. However, such observations nearly disappeared after [Plaintiff] began mental health treatment. He also was consistently able to interact effectively with treatment providers and examiners even when somewhat hostile.

Tr. at 22.

Plaintiff argues that "[t]he ALJ's two reasons for finding only moderate impairment are directly contradicted by the record." Pl.'s Mem. at 18. Plaintiff asserts that "every single treatment record from a mental health treatment provider references serious, ongoing, and chronic problems with social functioning." Id. at 19 (emphasis omitted). According to Plaintiff, "nothing about th[e] record . . . can rationally suggest that Plaintiff's maladaptive social behaviors 'nearly disappeared' as the ALJ suggests." Id. Responding, Defendant argues that "substantial evidence supports the ALJ's reasoning" because "despite some displays of irritability or tenseness, [Plaintiff's] thought processes, speech, and mood were generally normal, and he was cooperative." Def.'s Mem. at 7.

The ALJ erred in finding that Plaintiff has "moderate difficulties" in social functioning. Tr. at 22. Although the ALJ noted that Plaintiff had certain difficulties in social functioning, she erroneously found that these behaviors "nearly disappeared" after December 2013,

when Plaintiff began mental health treatment. Tr. at 22; see Tr. at 506-507 (earliest mental health treatment notes in administrative record).[9]

The ALJ's findings that Plaintiff's defensive attitude toward doctors and his difficulties with going out in public, having friends, and being told what to do "nearly disappeared" are inaccurate and to an extent inconsistent with the record. Mental treatment notes from July 2014 indicate that Plaintiff has "no friends" and does not "socialize anymore [be]cause of it." Tr. at 486. According to a treatment note dated April 2015, Plaintiff became "upset and offensive" after his treating neurologist informed Plaintiff that his medication regimen needed to be modified. Tr. at 536. At the hearing held in October 2015, Plaintiff testified that he "do[es not] like being around [the] public" and that he "get[s] . . . social anxiety," has "a lot of fear," and is afraid of having a seizure in public. Tr. at 61. The ALJ cites no evidence, nor can the undersigned find any, showing that Plaintiff's defensive attitude toward doctors, lack of friends, difficulties with going out in public, and dislike of being told what to do have "nearly disappeared." Tr. at 22.

The record also reflects that Plaintiff's anger outbursts and mood swings persisted after he began mental health treatment. Although the frequency of anger outbursts decreased after he started mental health treatment in December 2013, it decreased only from daily to five times a week after more than a year of treatment with the goal of reducing the frequency of anger outbursts to once a week. See Tr. at 506 (December 2013 note indicating the goal of treatment is to "reduce [Plaintiff's] anger outbursts from daily to once weekly"); Tr. at 516 (September 2014 treatment note indicating Plaintiff reduced anger

---

[9]     On November 25, 2013, Plaintiff's wife reported that Plaintiff was "currently going to a therapist," Tr. at 338, but the administrative transcript does not contain treatment notes from a therapist dating back to November 2013.

outbursts from daily to three times a week); Tr. at 580 (February 2015 note indicating goal of treatment is to reduce the frequency of "intrusive thoughts and anger outbursts" from five times a week to once a week). Thus, the undersigned finds inaccurate the ALJ's statement that Plaintiff's anger outbursts "nearly disappeared" given that their frequency only decreased from daily to five times a week with the goal still being to reduce them to once a week. Likewise, the ALJ's finding that Plaintiff's mood swings "nearly disappeared" is inaccurate. See Tr. at 512 (December 2014 note indicating Plaintiff's "mood swings [are] uncontrolled"); Tr. at 571 (July 2015 note indicating goal of treatment is to decrease frequency of Plaintiff's mood swings from four days a week to zero days a week).

In sum, the ALJ's finding that Plaintiff has moderate limitations in social functioning is not supported by substantial evidence. Accordingly, the undersigned recommends that the matter be remanded for reconsideration of Plaintiff's limitations in social functioning.

### 2. Activities of Daily Living

Activities of daily living are "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for . . . grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1) (effective December 18, 2007) (revised September 26, 2016). An ALJ assesses the quality of these activities by their "independence, appropriateness, effectiveness, and sustainability." Id. The ALJ also determines "the extent to which [a claimant is] capable of initiating and participating in activities independent of supervision or direction." Id.

A "marked" limitation in activities of daily living is not determined "by a specific number of different activities of daily living in which functioning is impaired, but by the nature and

overall degree of interference with function." Id. An individual who performs a "wide range of activities of daily living," may still be considered to have a marked limitation in this area if he has "serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions." Id.

Here, in concluding that Plaintiff has "moderate restriction[s]" of activities of daily living, the ALJ relied on the following findings:

> [Plaintiff] reports that his wife has to constantly remind him to take care of personal needs and grooming and to take his medication, and that he is not always cooperative with her. However, he consistently appeared to be well groomed at mental health treatment visits, and there is little other evidence in the record showing that he has difficulties in this area.

Tr. at 22 (citation omitted).

Plaintiff contends the ALJ "did not consider the entire record" when finding that Plaintiff has only moderate restrictions of activities of daily living. Pl.'s Mem. at 21. Specifically, Plaintiff asserts the ALJ did not consider the detailed function report from Plaintiff's wife that, according to Plaintiff, is supported by medical evidence in the administrative transcript. Id. Further, argues Plaintiff, "the ALJ misrepresents the record[ ] stating 'there is little other evidence in the record showing difficulties.'" Id. (quoting Tr. at 22). According to Plaintiff, "it appears the ALJ is basing her entire finding of moderate limitations in activities of daily living on the fact that Plaintiff presents with good hygiene." Id. at 22. Responding, Defendant contends the ALJ's finding is supported by substantial evidence because Plaintiff "could drive when needed," "perform basic acts of self-care with his wife's assistance," "attend doctor's visits independently," and "demonstrated appropriate grooming and hygiene." Def's Mem. at 6. Addressing Plaintiff's argument that the ALJ did not consider

the record as a whole, Defendant asserts that the ALJ's failure to discuss Plaintiff's wife's function report is harmless "because specific discussion of the [report] would not affect the outcome of this case." Id. at 8. According to Defendant, "Plaintiff's wife's statements are essentially redundant of [Plaintiff's] own testimony and statements, which the ALJ credited to the extent she found them supported by the record." Id. at 8-9 (citation omitted); see Tr. at 24 (credibility determination).

The ALJ's finding that Plaintiff has "moderate restriction[s]" of activities of daily living is not supported by substantial evidence because in making that finding, the ALJ inaccurately stated that "there is little other evidence in the record showing that he has difficulties in this area." Tr. at 22. The ALJ apparently found that apart from Plaintiff's wife's constant reminders to Plaintiff to "take care of his personal needs and grooming" and Plaintiff's uncooperativeness with his wife, the record contains "little . . . evidence" showing that he has restrictions of activities of daily living. Tr. at 22. The ALJ's statement is a mischaracterization of the record because the administrative transcript contains significant evidence, apart from that cited by the ALJ, showing that Plaintiff has difficulties performing activities of daily living. Further, although Defendant refers to certain reports and notes in the record to argue that there is substantial evidence to support the ALJ's finding, the ALJ did not address them when making the finding of moderate restrictions, and "a court may not accept appellate counsel's post hoc rationalizations for agency actions." Baker v. Comm'r of Soc. Sec., 384 F. App'x 893, 896 (11th Cir. 2010) (citing FPC v. Texaco Inc., 417 U.S. 380, 397 (1974)).

Assessing the quality of Plaintiff's activities of daily living by their "independence, appropriateness, effectiveness, and sustainability," it is clear the ALJ erred in stating that

"there is little other evidence in the record showing that [Plaintiff] has difficulties in [activities of daily living]." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1) (effective December 18, 2007) (revised September 26, 2016); Tr. at 22. First, Plaintiff is dependent on others in almost every activity of daily living, including grooming. See, e.g., Tr. at 61 (Plaintiff's hearing testimony that he does "not even do groceries with [his] wife"); Tr. at 283, 326 (Plaintiff's reports indicating his wife, and sometimes his father, does all the shopping); Tr. at 307, 334 (Plaintiff's wife's reports indicating she does all the shopping); Tr. at 276, 282 (Plaintiff's reports indicating he does not cook or prepare meals); Tr. at 333 (Plaintiff's wife's report indicating Plaintiff does not cook or prepare meals); Tr. at 62 (Plaintiff's hearing testimony that his wife does all the household chores and that his "wife does everything for [him]"); Tr. at 63 (Plaintiff's hearing testimony that his wife reminds him to "take a shower[ and] change [his] shirt"); Tr. at 399 (psychological evaluation progress note indicating Plaintiff is "neglecting his self-hygiene"); Tr. at 281, 324 (Plaintiff's reports indicating Plaintiff's wife sometimes helps him dress and bathe); Tr. at 305, 332 (Plaintiff's wife's reports indicating she sometimes helps Plaintiff dress and bathe); Tr. at 283, 284, 326 (Plaintiff's reports indicating his wife handles all of his finances); Tr. at 307, 308, 334 (Plaintiff's wife's reports indicating she handles all of his finances); Tr. at 399 (psychological evaluation progress note indicating Plaintiff's wife handles all of his finances). Plaintiff's degree of dependency in regards to his grooming is especially critical because the quality of Plaintiff's activities must be evaluated by their independence, and the fact that "Plaintiff consistently appeared to be well groomed at mental health treatment visits," was one of the few findings the ALJ relied

upon when concluding Plaintiff has moderate restrictions of activities of daily living. Tr. at 22; see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1) (effective December 18, 2007) (revised September 26, 2016).

Second, the record shows Plaintiff leaves his house only when it is necessary to go to doctor's appointments and the pharmacy. See, e.g., Tr. at 283, 284, 285 (Plaintiff's reports) Tr. at 307, 308 (Plaintiff's wife's reports); Tr. at 283, 326 (Plaintiff's reports indicating he is afraid to drive); Tr. at 65 (Plaintiff's hearing testimony that he does not attend any of his children's school events or sports events). Third, while at home, "most of the time[, he] just lay[s] on [his] recliner," Tr. at 281 (Plaintiff's report), and "pace[s] around the house," Tr. at 332 (Plaintiff's wife's report); see also Tr. at 305 (Plaintiff's wife's report indicating Plaintiff just sits on the recliner while at home); Tr. at 399 (psychological evaluation progress note indicating that while at home Plaintiff "wanders around the house, takes naps and stays alone").

The undersigned recognizes that the evidence discussed above consists in large part of Plaintiff's reports and testimony and that, later in the Decision, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible . . . ." Tr. at 24. However, the ALJ's failure, when making her step-three finding, to even refer to critical, relevant evidence regarding Plaintiff's restrictions of activities of daily living frustrates the Court's review. This is because it is unclear whether and to what extent the ALJ, in making her step-three finding, discredited Plaintiff's numerous reports and testimony about activities of daily living, especially given that the ALJ evidently credited

Plaintiff's "reports [indicating] that his wife has to constantly remind him to take care of personal needs and grooming and to take his medication, and that he is not always cooperative with her." Tr. at 22.[10]

This is significant because, as previously mentioned, the evidence that the ALJ failed to discuss indicates Plaintiff may have more than moderate restrictions of activities of daily living and is inconsistent with the ALJ's statement that "there is little other evidence in the record showing that he has difficulties in [activities of daily living]." Tr. at 22. Notwithstanding the ALJ's credibility finding, without an explanation of why the majority of Plaintiff's reports and testimony were ignored or rejected in this regard, the undersigned is unable to find that substantial evidence supports the ALJ's ultimate finding that Plaintiff has "moderate restriction[s]" of activities of daily living, given the apparent inaccuracy of her statement that there is "little other evidence in the record" showing further restrictions in this area. Tr. at

_____

[10]     It is also unclear whether some of Plaintiff's reports (such as those indicating he does not cook, shop, or do any household chores) were simply not considered by the ALJ as they are not discussed anywhere in the Decision. See Tr. at 24-32. The undersigned notes, however, that the ALJ references reports made by Plaintiff during his September 2013 consultative psychological evaluation with William W. Austin, Psy.D and Zahydie Burgos, Psy.D. See Tr. at 29 (ALJ Decision); Tr. at 398-401 (progress notes). In doing so, the ALJ cited some reports including those indicating Plaintiff was neglecting his self-hygiene, "drove only when needed," and his wife managed his funds. Tr. at 29. The ALJ gave the opinion contained in the progress note "some weight since it is supported by Drs. Austin and Burgos' examination findings," Tr. at 29, and stated that "[Plaintiff's] presentation on this occasion was inconsistent with the mental status findings made by [Plaintiff's] treatment providers, including that [Plaintiff's] memory was intact or that he had good recent and remote memory," Tr at 30. The ALJ, however, did not point to any inconsistencies in Plaintiff's reports regarding his activities of daily living, and it is not clear from the Decision, or the record, that there are any inconsistencies in this regard. Indeed, immediately prior to discussing the September 2013 psychological evaluation progress notes, the ALJ specifically highlighted that Plaintiff's reports regarding his inability to concentrate were inconsistent with mental status examination findings, but she did not state that there were any inconsistencies regarding his reports on activities of daily living. See Tr. at 29 (stating that Plaintiff's "contemporaneous reports to treatment providers and his mental status examination findings are inconsistent with his allegations of inability to concentrate or comprehend information . . ."). Thus, it is unclear whether and to what extent the ALJ discredited Plaintiff's other reports made during the psychological evaluation, which reports are inconsistent with her statement that there is "little other evidence in the record" indicating Plaintiff has restrictions of activities of daily living. Tr. at 22.

22.[11] Accordingly, remand is required for redetermination of Plaintiff's limitations in activities of daily living, with proper consideration of relevant evidence.

### 3. Plaintiff's Headaches and Seizures

Plaintiff correctly states that "the ALJ [did] not take into account Plaintiff's headaches and seizures when considering [Plaintiff's social functioning and activities of daily living]." Pl.'s Mem. at 22; see Tr. at 22. According to Plaintiff, "[t]he fact that the medical evidence of record shows that Plaintiff experiences chronic migraines on a daily basis and seizure activity on a weekly basis severely impacts the quality of . . . Plaintiff's life." Pl.'s Mem. at 22-23. Given the impact Plaintiff's headaches may have on his ability to perform activities of daily living, the ALJ on remand should consider Plaintiff's seizures and headaches and their impact on Plaintiff's social functioning and ability to perform activities of daily living. See, e.g., Tr. at 48-50 (Plaintiff's hearing testimony regarding daily headaches); Tr. at 535, 538, 541, 544, 547, 550, 553, 556, 559 (medical notes indicating persistence of headaches); Tr. at 283, 326 (reports indicating Plaintiff is afraid to drive because of his disabilities or seizures); Tr. at 61 (Plaintiff's hearing testimony that he is afraid to go out in public because he is afraid of having a seizure).

## B. Listing 11.18

At step three of the sequential evaluation process, the burden rests on the claimant to prove the existence of a listing-level impairment. Carnes v. Sullivan, 936 F.2d 1215, 1218

---

[11]     This error is not harmless because a proper determination of Plaintiff's limitations in activities of daily living is potentially determinative of whether he meets or equals Listing 12.02, as explained in more detail below.

(11th Cir. 1991). Mere diagnosis of a listed impairment is not sufficient. See, e.g., id.; see also Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002). "To meet a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." Wilson, 284 F.3d at 1224 (internal quotations and citations omitted). "To equal a Listing, the medical findings must be at least equal in severity and duration to the listed findings." Id. (internal quotations and citations omitted).

When a claimant alleges multiple impairments, "a claim for social security benefits may lie even though none of the impairments, considered individually, is disabling." Walker v. Bowen, 826 F.2d 996, 1001 (11th Cir. 1987) (quoting Bowen v. Heckler, 748 F.2d 629, 635 (11th Cir. 1984)). An ALJ must "make specific and well-articulated findings as to the effect of the combination of impairments and . . . decide whether the combined impairments cause the claimant to be disabled." Id. The ALJ, however, is not required to "mechanically recite the evidence leading to her determination" because "[t]here may be an implied finding that [the] claimant does not meet a [L]isting." Hutchison v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986). The United States Court of Appeals for the Eleventh Circuit has held that an ALJ properly considered the claimant's impairments in combination when she stated, "[B]ased upon a thorough consideration of all evidence, the ALJ concludes that appellant is not suffering from any impairment, or a combination of impairments of sufficient severity to prevent him from engaging in any substantial gainful activity for a period of at least twelve

continuous months." <u>Wheeler v. Heckler</u>, 784 F.2d 1073, 1076 (11th Cir. 1986) (emphasis omitted).

Listing 11.18 addresses cerebral trauma and directs the Commissioner to "[e]valuate [the impairment or combination of impairments] under the provisions of 11.02 [(convulsive epilepsy)], 11.03 [(nonconvulsive epilepsy)], 11.04 [(central nervous system vascular accident)] and 12.02 [(organic mental disorders)], as applicable." 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.18 (effective December 15, 2004) (revised July 1, 2016), https://secure.ssa.gov/poms.nsf/lnx/0434131013.[12] Cerebral trauma, also referred to by the SSA as a traumatic brain injury, "may result in neurological and mental impairments with a wide variety of posttraumatic symptoms and signs." <u>Id.</u> § 11.00(F). Here, Plaintiff contends that "[t]he residual effects of Plaintiff's hemorrhage condition meets and equals Listing 11.18[ ] for cerebral trauma" because he meets or equals Listings 11.03 and 12.02. Pl.'s Mem. at 23; <u>see</u> <u>id.</u> at 24-25 (Listing 11.03 argument), 25-27 (Listing 12.02 argument).[13] Thus, Listings 11.03 and 12.02 are discussed in turn.

_____

[12]     On July 1, 2016, the SSA revised the Listings criteria used to evaluate disability claims involving neurological disorders, including sections 11.18 and 11.03, effective September 29, 2016. <u>See</u> Revised Medical Criteria for Evaluating Neurological Disorders, 81 Fed. Reg. 43048-01, 2016 WL 3551949, at *43048. The SSA clarified, however, that it expects "that [f]ederal courts will review the Commissioner's final decisions using the rule[s] that were in effect at the time [the SSA] issued the decisions." <u>Id.</u> at *43051 n.6. Thus, the relevant versions of these Listings for purposes of this appeal are the ones that were in effect on January 8, 2016, the date of the ALJ's decision. <u>See</u> Tr. at 34.

[13]     The ALJ did not address Listing 11.18 in the Decision, but she explicitly considered Listing 11.03. <u>See</u> Tr. at 22. The ALJ did not address Listing 12.02. <u>See generally</u> Tr. at 22-23.

1. Listing 11.03: Non-Convulsive Epilepsy

"Listing 11.03, which addresses non-convulsive epilepsy, requires detailed documentation of seizures that occur more frequently than once a week, in spite of at least three months of prescribed treatment." Bellew v. Acting Comm'r of Soc. Sec., 605 F. App'x 917, 921 (11th Cir. 2015) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03 (effective December 15, 2004) (revised July 1, 2016)). The description must include "the presence or absence of aura, tongue bites, spincter control, injuries associated with the attack, and postictal phenomena." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00(A) (effective December 15, 2004) (revised July 1, 2016). The Listing also requires a showing of "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." Bellew, 605 F. App'x at 921 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03 (effective December 15, 2004) (revised July 1, 2016)). Moreover, "the criteria [of Listing 11.03] can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00(A) (effective December 15, 2004) (revised July 1, 2016).

Here, Plaintiff argues he meets or equals Listing 11.03 because he experiences "seizure[-]like events" and "frequent, severe and persistent headaches lasting upwards of [three] hours a day." Pl.'s Mem. at 25. He contends he has been compliant with his treatment for headaches, and "the only notation regarding noncompliance issues comes from before the SSI application date." Id. at 24. Thus, argues Plaintiff, "the evidence demonstrates that

given all these factors, frequency and duration, Plaintiff meets or equals . . . Listing [11.03, which is] required to be considered under the Listing 11.18 umbrella." Id. at 25.

Responding, Defendant contends that Plaintiff does not meet Listing 11.03 because Plaintiff did not submit the medical documentation required to meet the Listing's criteria. See Def.'s Mem. at 13-15. Specifically, Defendant argues that Plaintiff failed to "submit '[a]t least one detailed description of a typical seizure . . .' as required." Def.'s Mem. at 13 (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.00(A) (effective December 15, 2004) (revised July 1, 2016)). Defendant asserts that "Plaintiff did not produce medical evidence showing his headaches or seizure-like episodes were accompanied by 'alteration of awareness or loss of consciousness.'" Id. at 14 (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.03 (effective December 15, 2004) (revised July 1, 2016)). Defendant further contends that Plaintiff "did not produce evidence showing his seizure-like episodes occurred more than once weekly for a three-month period." Id. at 14 (citation omitted); see Bellew, 605 F. App'x at 921. Lastly, Defendant argues that "Plaintiff's noncompliance with treatment shows he does not meet or medically equal this Listing." Def.'s Mem. at 14.

In finding that Plaintiff does not meet or medically equal the severity of any of the Listings, the ALJ stated she "considered [Plaintiff's] seizures and migraine headaches under [L]isting 11.03." Tr. at 22. But, according to the ALJ, "the record does not contain detailed documentation as required to establish a typical seizure and/or headache pattern including all associated phenomena at the frequency or with the manifestations required under the [L]isting." Tr. at 22.

The medical evidence indicates that Plaintiff's seizure-like episodes involve "jerking of the head and tongue," Tr. at 538, 541, "eye, mouth and head tremors," Tr. at 544, "jittering of both eyes," Tr. at 547, a "metallic taste in [the] mouth," and "dry mouth," Tr. at 535. The episodes last around "a few seconds to a minute." Tr. at 538, 541, 544; see also Tr. at 535, 547. According to a treatment note dated April 28, 2015, Plaintiff reported that these episodes occur one to two times a week. Tr. at 535; see also Tr. at 48 (Plaintiff's hearing testimony that episodes occurred "two, three times a week"). The record reflects Plaintiff has experienced these episodes from December 31, 2013, Tr. at 556, through at least April 28, 2015, Tr. at 535. See also Tr. at 538, 541, 544, 547, 550, 553. The medical evidence indicates these episodes occur despite Plaintiff's compliance with his seizure medication, Keppra and Trokandi. See Tr. at 535, 538, 541, 544, 547, 550, 553, 556. Thus, the record shows Plaintiff has experienced seizure-like episodes for at least three months "in spite of at least three months of prescribed treatment," Bellew, 605 F. App'x at 921, although it is unclear whether they have been occurring at least once a week for at least three months.

Plaintiff, however, submitted no evidence indicating that his seizure-like activity results in an "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." Id. (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03 (effective December 15, 2004) (revised July 1, 2016)). In fact, according to the April 28, 2015 treatment note, Plaintiff reported that "[h]e maintains consciousness throughout the episodes." Tr. at 535. Plaintiff thus failed to provide sufficient documentation showing that his seizures meet or equal the criteria in

Listing 11.03. See Wilson, 284 F.3d at 1224.[14] Accordingly, the undersigned finds that substantial evidence supports the ALJ's finding that Plaintiff does not meet or equal Listing 11.03. See Tr. at 22.

### 2. Listing 12.02: Organic Mental Disorders

Listing 12.02 addresses "[o]rganic mental disorders." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02 (effective December 18, 2007) (revised September 26, 2016). Organic mental disorders are defined as "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain." Id. Listing 12.02 consists of "a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations)." Id. § 12.00(A). It also contains paragraph C criteria (additional functional limitations), which are assessed only if the ALJ finds that the paragraph B criteria are not satisfied. Id. An impairment meets the required severity of Listing 12.02 "when the requirements in both A and B are satisfied, or when the requirements in C are satisfied." Id. § 12.02.

Under paragraph A of Listing 12.02, the following medical findings are required:

Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

　　1. Disorientation to time and place; or

---

[14] To the extent Plaintiff argues his headaches meet Listing 11.03, this argument likewise fails because Plaintiff did not present any evidence, nor can the undersigned find any, that his headaches result in an "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." Bellew, 605 F. App'x at 921 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03 (effective December 15, 2004) (revised July 1, 2016)).

2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

4. Change in personality; or

5. Disturbance in mood; or

6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc[.]

Id. § 12.02(A).

Paragraph B requires that the clinical findings under paragraph A result in at least two of the following functional limitations: 1) a "[m]arked restriction of activities of daily living"; 2) "[m]arked difficulties in maintaining social functioning"; 3) "[m]arked difficulties in maintaining concentration, persistence, or pace"; or 4) "[r]epeated episodes of decompensation, each of extended duration." Id. § 12.02(B)

Lastly, paragraph C contains the following additional functional criteria:

Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change

in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Id. § 12.02(C).

Here, the ALJ did not address Listing 12.02, but she expressly considered Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders), see Tr. at 22-23, which contain similar criteria as Listing 12.02, see 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02, 12.04, 12.06 (effective December 18, 2007) (revised September 26, 2016). Even though she did not expressly consider Listing 12.02, it "may be implied from the . . . [D]ecision" that she found Plaintiff's impairments do not meet or equal Listing 12.02. James v. Comm'r, Soc. Sec. Admin., 657 F. App'x 835, 838 (11th Cir. 2016); see also Hutchison, 787 F.2d at 1463.

Plaintiff argues he meets or equals Listing 12.02 because he satisfies the criteria in paragraph A and paragraph B or, alternatively, the paragraph C criteria. Pl.'s Mem. at 26-27. He contends he meets the requirements in paragraph A of "changes in personality, disturbances in mood and emotional lability." Id. at 26; see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02(A)(4)-(6) (effective December 18, 2007) (revised September 26, 2016). He asserts he satisfies paragraph B because he "has proven he has marked limitations in [social functioning and activities of daily living]." Pl.'s Mem. at 26; see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02(B)(1)-(2) (effective December 18, 2007) (revised September 26, 2016). Plaintiff also asserts that, alternatively, he satisfies paragraph C for the following reasons: 1) "he has medical documentation of a chronic organic mental disorder going all the way

back to 2011," which has "caused more than a minimal limitation of ability to do basic work activities"; 2) his "emotional lability and anger problems make it such that even a minimal increase in demands or stress would cause him to decompensate"; and 3) he "relies on his wife to handle virtually every aspect of his daily life" and this has "persisted throughout the entire SSI application process." Pl.'s Mem. at 26-27; see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02(C)(1)-(3) (effective December 18, 2007) (revised September 26, 2016).

Responding, Defendant argues that "Plaintiff has not satisfied the requirements of Listing 12.02(A) and (B) or the requirements of Listing 12.02(C)." Def.'s Mem. at 17 (emphasis omitted). Defendant does not address specifically whether Plaintiff satisfies paragraph A, but she contends that Plaintiff does not satisfy the paragraph B criteria because the ALJ properly found that Plaintiff has only moderate limitations in social functioning and activities of daily living, and no repeated episodes of decompensation. Id.; see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02(C)(1)-(2) (effective December 18, 2007) (revised September 26, 2016). As to paragraph C, Defendant contends Plaintiff does not satisfy its criteria because he "failed to produce medical evidence of repeated episodes of decompensation of extended duration during the relevant period." Def.'s Mem. at 17; see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02(C)(1) (effective December 18, 2007) (revised September 26, 2016). Defendant further asserts that Plaintiff's "ability to engage in some personal care and activities of daily living, as discussed in the ALJ's decision, supports [the] finding" that Plaintiff failed to meet the criteria in 12.02(C)(2) and (C)(3). Def.'s Mem. at 17.

As noted above, the ALJ's finding that Plaintiff has "moderate" limitations in social functioning and activities of daily living is not supported by substantial evidence. On remand,

a proper evaluation of Plaintiff's limitations in these two functional areas may impact the ALJ's determination of whether Plaintiff satisfies paragraph B of Listing 12.02. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02(B)(1)-(2) (effective December 18, 2007) (revised September 26, 2016). Similarly, a proper assessment of Plaintiff's limitations in activities of daily living may impact the ALJ's determination of whether Plaintiff satisfies paragraph C of the Listing, specifically its third listed criterion requiring a "[c]urrent history of [one] or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." Id. § 12.02(C)(3). For these reasons, the issue of whether Plaintiff's impairments meet or equal Listing 12.02 need not be addressed. See Jackson, 801 F.2d at 1294 n.2 (declining to address certain issues because they were likely to be reconsidered on remand); Demenech, 913 F.2d at 884 (concluding that certain arguments need not be addressed when the case would be remanded on other issues). Due to the similarities between the criteria of Listings 12.04 and 12.06 and those of Listing 12.02, a proper evaluation of Plaintiff's restrictions of activities of daily living may impact the ALJ's findings under Listings 12.04 and 12.06 as well.

### V. Conclusion

In accordance with the foregoing, it is hereby **RECOMMENDED THAT**:

1.      The Clerk of Court be directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g), as incorporated by § 1383(c)(3), **REVERSING** the Commissioner's final decision and **REMANDING** this matter with the following instructions:

(A)     Reevaluate the severity of Plaintiff's limitations in the functional areas of social functioning and activities of daily living;

-28-

      (B)    Reevaluate, if appropriate, whether Plaintiff's impairments meet or medically equal Listing 11.18 (as evaluated under Listing 12.02), Listing 12.04, and Listing 12.06;

      (C)    Reevaluate, if appropriate, Plaintiff's residual functional capacity; and

      (D)    Take such other action as may be necessary to resolve this matter properly.

2.    The Clerk be further directed to close the file.

3.    Plaintiff's counsel be advised that, in the event benefits are awarded on remand, any § 406(b) fee application shall be filed within the parameters set forth by the Order entered in Case No. 6:12-mc-124-Orl-22 (In Re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. § 406(b)).

    **RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on January 30, 2018.

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

bhc

Copies to:

Honorable Paul G. Byron
United States District Judge

Counsel of record